1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   TITENESHA RUSSELL,

11              Petitioner,          No. 2:08-cv-1538-WBS-JFM (HC)

12        vs.

13   MARY LATTIMORE, Warden,

14              Respondent.          FINDINGS AND RECOMMENDATIONS

15   _____/

16          Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner is serving a sentence of twenty-five years

18   to life in prison following her 2006 conviction on charges of attempted murder, attempted

19   kidnapping for the purpose of robbery, conspiracy to commit murder, assault with a deadly

20   weapon, and attempted robbery.  Petitioner raises four claims in her amended petition, filed

21   August 18, 2008.  First, petitioner claims that the jury was given an improper instruction on

22   aggravated kidnapping.  Second, petitioner claims that there was insufficient evidence to support

23   the conviction for aggravated kidnapping.  Third, petitioner seeks reconsideration of a California

24   Supreme Court decision interpreting CALCRIM 404.[1]  Finally, petitioner claims that the jury was

25   _____

26        [1]  Petitioner's third claim for relief is not clear on the face of the amended petition.  In the
     answer, respondent asserts that the claim "mirrors a claim in her petition for review that

1

improperly instructed on aider and abettor liability under the doctrine of natural and probable

consequences in that the instruction permitted a finding of guilt on the charge of attempted

murder without a finding that petitioner premeditated the attempted murder.

FACTS[2]

## A.  The Prosecution's Case

L.R. dated Buford before she became pregnant with his child in February 2004.  As the pregnancy progressed, Buford told L.R. she should have an abortion.  L.R. wanted to have the baby and told Buford that he could "just pay child support" if he "didn't want to be there."  Buford acted indifferently and began to deny that the child was his.  When L.R. was about five months pregnant, L.R. and Buford broke off their relationship.

At some time in the weeks leading up to the assault, L.R. called Buford's cell phone.  A woman answered and identified herself as Buford's sister.  The same woman, whose voice L.R. identified as Russell's, called L.R. to ask about the baby and the identity of the father.  She continued to make harassing phone calls to L.R., calling her a "bitch" and threatening to kill L.R. and her baby.

Before the assault, L.R. told Buford that he had $700 and was willing to lend him money to repair his car.  She lived with her grandmother and kept the money there.

Boone testified pursuant to her agreement to cooperate with the district attorney's office.  She and Buford were "best friends."  On September 20, 2004, five days before the assault and kidnapping, Buford asked Boone to "beat somebody up."  She agreed to help him.  In subsequent conversations, Boone learned that Buford and L.R. had argued over whether he was the baby's father.

Between September 20 and September 25, Buford and Boone devised a plan.  Buford would invite L.R. to the movies but take her to a park where Boone would beat her up.  The goal was to

---

challenges CALCRIM No. 404, which states that evidence of intoxication should not be considered in deciding whether attempted murder is a natural and probable consequence of assault with a deadly weapon."  Answer, filed October 23, 2008, at 18.

[2]  The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Dwayne Michael Curry, et al., No. C052801, a copy of which was lodged by respondent on December 30, 2008 as lodged document number 6, as modified by order filed January 23, 2008, a copy of which was lodged by respondent on December 30, 2008 as lodged document number 8.

2

force L.R. to have a miscarriage.  Boone asked [petitioner] to help beat up L.R. and she agreed.

At about 8:00 p.m. on September 25, 2004, Buford picked up L.R. at her home for the ostensible purpose of taking her to the movies.  He was driving a white Chevrolet Malibu.  Curry, whom L.R. knew through Buford as "Pacman," was sitting in the back seat.  Buford picked up [petitioner], who joined Curry in the back seat, then drove to a liquor store.  After Buford, Curry and [petitioner] bought liquor, everyone changed seats.  [Petitioner] drove with Curry beside her.  Buford and L.R. were in the back seat.  Instead of going to the movies, defendants drove L.R. to a park in Elk Grove.

Buford and [petitioner] informed Boone of their whereabouts by cell phone, while she waited for their arrival at the park.  Buford, Curry and [petitioner] drank behind some bushes and L.R. sat by herself.  Eventually, L.R. told Buford she wanted to go home and he agreed to drive her back.  Buford had his arm around L.R.'s waist, but turned sideways as they walked.

When Buford gave the signal, Boone and [petitioner] ran in front of him and L.R., turned, and Boone sprayed L.R. in the face with mace.  Boone also hit L.R. in the face.  L.R. tried to fight back but was blinded by the mace.  [Petitioner] joined in the fray and punched L.R. in the face.  L.R. fell to the ground.  L.R. told her attackers that she was pregnant.  When L.R. asked Buford for help, he responded, "[J]ust fight back."

The attack continued while L.R. was on the ground.  Curry kicked her in the side.  He also threw a garbage can at L.R., hitting her in the head.  Boone removed L.R.'s tennis shoes and someone took her cell phone.  At that point, Boone and Russell left in the Malibu by themselves.  They drove north on Interstate 5 toward Meadowview where Russell's grandmother lived.

Back at the park, L.R. asked Buford to call an ambulance and he said, "Okay."  However, instead of calling the ambulance, Buford called Boone and told her to "come back and finish the job."  Boone asked Buford if he was trying to kill L.R., and Buford said, "[N]o, just the baby."  He wanted Boone to continue, "as long as that baby gets up out of her."  While [petitioner] and Boone were driving back to the park, Buford called again to tell them to bring a baseball bat and flashlight from the car.

Boone and [petitioner] approached L.R. at the park carrying a flashlight and baseball bat.  Boone struck L.R.'s leg with the bat and [petitioner] hit her in the head with the flashlight.  The women told L.R. that Buford was not the father of her baby and he was not going to pay child support.  L.R. named someone else as the baby's father because she wanted the beating to stop.

3

Boone testified that while [petitioner] and L.R. continued to fight, Curry hit L.R. in the head, knocking her to the ground. Boone also stated that Curry kicked L.R. with both feet as she lay on the ground saying, "Help me, my baby." L.R. lost consciousness while she was on the ground.

Boone and Curry began searching L.R.'s clothing for money. Boone took $20 that they found inside L.R.'s bra. Changing her earlier testimony that she first learned of L.R.'s $700 in the car after they all left the park, Boone stated on redirect examination that Buford and Curry were looking for the $700 when Curry pulled L.R.'s clothes off. Curry removed L.R.'s pants and someone removed her socks. The defendants carried L.R. to the Malibu.

Once inside the car, Buford showed Boone and Russell a picture of the $700 on his cell phone, an image he had received from L.R. Athough L.R. was not fully conscious, Buford suggested that they get the money from L.R.'s house by having her call her brother and asking him to bring it to the car.

Curry drove to [petitioner]'s apartment to get clean pants and underwear for L.R. [Petitioner]'s roommate brought the clothes to the car and Boone and Russell put them on L.R. in the back seat of the car. [Petitioner] put a BB gun on her lap to scare L.R.

Curry continued to drive. [Petitioner], Boone and Curry bought and smoked marijuana with the $20 they had taken from L.R. When someone looked in the car, [petitioner] stated, "See what we do? See how we beat up bitches?" They let L.R. out of the car to urinate near a tree, but Boone and [petitioner] stood next to her.

Once L.R. was awake, the defendants turned their attention to the money. Boone and [petitioner] told L.R. that she "better find some way" to retrieve the $700. Someone handed L.R. a cell phone and ordered her to call home. L.R. telephoned her grandmother and told her to send L.R.'s brother outside with her purse.

L.R.'s grandmother stepped outside of the house at 1:00 a.m. and saw the Malibu approaching. Curry sped away and L.R. called her grandmother again, telling her to send L.R.'s brother to the car with the money. Sensing trouble, L.R.'s grandmother asked if she was being held against her will. L.R. said that she was.

Curry pulled up again and L.R.'s brother approached the car. When he saw that L.R.'s face was bruised and bleeding, he told the occupants of the car to let her out. Instead, Curry drove off with L.R.'s brother holding onto the car door. L.R.'s grandmother called 911 when L.R.'s brother came inside.

4

L.R. asked to be taken to a hospital, but Curry refused.  After discussing alternatives, the defendants left L.R. by the side of the road.  Curry drove to [petitioner]'s apartment where he, [petitioner] and Boone spent the night.

L.R. walked to a nearby apartment where a resident found her and called 911.  L.R. had bruises on her face and stomach and was fading in and out of consciousness.  An ambulance transported her to the hospital.

Doctors treated L.R. for a fractured eye socket and extensive bleeding inside the eye.  She was still experiencing double vision at the time of trial.  The doctors drained blood from both of L.R.'s swollen ears.  They noticed abrasions on L.R.'s face, abdomen and buttocks, and bruises all over her body.

Fetal heart monitors indicated that L.R.'s unborn baby was in distress and not receiving enough oxygen.  L.R. was nearly 32 weeks pregnant at the time of the assault and had not experienced any problems with her pregnancy.  Doctors delivered the baby by emergency Cesarean section.  The baby had an initial APGAR score of 1 on a scale of 1 to 10.  A normal baby has an initial APGAR score of 7 or 8.  Doctors placed the baby on a mechanical ventilator for 48 hours and supplied oxygen through its nasal passages for another five days.  The baby remained in the hospital for three weeks.

. . . .

**D.  [Petitioner]'s Defense:**

[Petitioner] testified that she spoke to L.R. one time before the assault.  She was on the speaker phone during a conversation between Boone and L.R.  Boone and L.R. were arguing over Buford and L.R. challenged Boone to a fight.

On the night of the assault, [petitioner] drove the Malibu with Buford, Curry and L.R. in the car.  She stopped at a liquor store and bought three bottles of Mad Dog 20/20.  Buford bought a Sprite.  [Petitioner] and Boone shared one bottle; Curry drank the second bottle; and all three of them shared the third bottle.  [Petitioner] testified that she took Ecstacy that night.  She also felt "out of character" because she does not drink.

[Petitioner] testified that she did not know that Boone was going to fight L.R. until they arrived at the park and Boone said, "I'm going to fuck this bitch up."  [Petitioner] offered to assist if she needed help.  She admitted socking L.R. in the face after L.R. bumped into her in what she described as a "cat fight."  Like Curry, [petitioner] claimed that she did not realize L.R. was pregnant until

/////

L.R. fell to the ground.  She testified that L.R. wore a pea coat that concealed her stomach.

[Petitioner] recounted that Buford had called Boone after they left the park the first time and told them to return to "finish the job."  According to [petitioner], it was the first time she realized that Buford wanted to force L.R. to have a miscarriage. [Petitioner] testified that at that point, she still felt the effects of the alcohol and Ecstacy, but "[n]ot . . . to the point where [she] didn't know what [she] was doing."

[Petitioner] testified that she retrieved the baseball bat and flashlight from the back seat of the Malibu, but denied hitting L.R. with the flashlight.  Russell and Boone put L.R. in the back seat of the Malibu while she was unconscious.

After everyone was in the car, Buford said L.R. had money and showed them the photo on his cell phone.  [Petitioner] told L.R. that she wanted the money and L.R. agreed to get it.  [Petitioner] assumed she agreed because she did not want to suffer another beating.  [Petitioner] acknowledged that there was a BB gun in the car, but claimed she never threatened L.R. with it.  [Petitioner] stated that the sole purpose of placing L.R. in the car was to take her home and that she never intended to force L.R. to stay in the car to rob her.  According to [petitioner], no one told Curry where to take L.R. after they drove away from L.R.'s house the second time.  Later that night, Curry bragged that he rendered L.R. unconscious and complained that he got her blood on his shoes.

People v. Curry et al., slip op. at 3-8, 10-12, as modified on denial of rehearing, Jan. 23, 2008, at 2, ¶¶ 1, 2.

ANALYSIS

I.  Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

1        Under section 2254(d)(1), a state court decision is "contrary to" clearly

2   established United States Supreme Court precedents if it applies a rule that contradicts the

3   governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4   indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

5   result.  Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406

6   (2000)).

7        Under the  "unreasonable application" clause of section 2254(d)(1), a federal

8   habeas court may grant the writ if the state court identifies the correct governing legal principle

9   from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10  prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11  simply because that court concludes in its independent judgment that the relevant state-court

12  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13  application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75

14  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

16       The court looks to the last reasoned state court decision as the basis for the state

17  court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

18  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

19  habeas court independently reviews the record to determine whether habeas corpus relief is

20  available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

21  II.  Petitioner's Claims

22       A.  Jury Instruction on Kidnap for the Purpose of Robbery (Aggravated Kidnapping)

23       Petitioner's first claim is that her constitutional rights were violated by use of the

24  pattern jury instruction on kidnap for the purpose of robbery, also known as aggravated

25  kidnapping, CALCRIM No. 1203, because the instruction allowed the jury to find her guilty of

26  the offense without finding that she had formed the intent to rob when the kidnapping began.

1   The last reasoned state court rejection of this claim is the decision of the California Court of

2   Appeal for the Third Appellate District on petitioner's direct appeal, which rejected the claim as

3   follows:

4          [Petitioner] contends that the Judicial Council of California
    Criminal Jury Instructions (Jan. 2006), CALCRIM no. 1203

5       (Kidnap for Robbery) improperly allowed the jury to convict her of
    aggravated kidnapping without finding that she had the intent to

6       rob L.R. at the time the kidnapping commenced.  We conclude that
    CALCRIM No. 1203 is a correct statement of the law.

7

8          The court instructed the jury on the elements of aggravated
    kidnapping as follows:

9       "[T]he defendants are charged in Count Four with kidnapping
    for the purpose of robbery.  To prove that a defendant is guilty of

10      this crime, the people must prove that, *one, the defendant intended
    to commit robbery; two, acting with that intent, the defendant took,*

11      *held or detained another person by force or instilling a reasonable
    fear; and, three, using that force or fear, the defendant moved the*

12      *other person or made the other person move a substantial
    distance*; and, four, the other person was moved or made to move a

13      distance beyond that merely incidental to the commission of the
    robbery; and, five, the other person did not consent to the

14      movement; and, six, the defendant did not actually and reasonably
    believe, that the other person consented to the movement.

15

16      "In order to consent, a person must act freely and voluntarily
    and know the nature of the act.  As used here, a substantial distance

17      means more than a slight or trivial distance.

18      "The movement must have substantially increased the risk of
    harm to the person beyond that necessarily present in the robbery.

19      In decided whether the movement was sufficient, consider all of
    the circumstances relating to the movement."  (Italics added.)

20         Although CALCRIM No. 1203 does not express state that the
    intent to rob must exist at the time the movement commences, we

21      conclude that the first three points of the instruction, set forth in
    italics, adequately express that requirement.  The instruction

22      describes the sequence of events starting with intent and followed
    by action – first to take, hold or detain the victim by force or fear,

23      and then to move the victim a substantial distance.  There was no
    error.

24

25  People v. Curry et al., slip op. at 17-19.

26  /////

1    A challenge to jury instructions does not generally state a federal constitutional

2  claim.  See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985), cert. denied, 478 U.S. 1021

3  (1986) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195,

4  1197 (9th Cir. 1983).  Habeas corpus is unavailable for alleged error in the interpretation or

5  application of state law.  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805,

6  814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  However, a

7  "claim of error based upon a right not specifically guaranteed by the Constitution may

8  nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire

9  trial that the resulting conviction violates the defendant's right to due process."  Hines v.

10  Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir.

11  1980), cert. denied, 449 U.S. 922 (1980)); see also Lisenba v. California, 314 U.S. 219, 236

12  (1941).

13    In order to warrant federal habeas relief, a challenged jury instruction "cannot be

14  merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

15  process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

16  (9th Cir. 1988), cert. denied, 488 U.S. 861 (1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146

17  (1973)).  On federal habeas review, the court is

18      "bound to presume that state courts know and follow the law, and
        we have been instructed that state-court decisions be given the
19      benefit of the doubt."  [Musladin v. Lamarque, 555 F.3d 830,] 838
        n. 6 [(9th Cir. 2009)] (citation, alteration and internal quotation
20      marks omitted).  This direction applies with even greater force
        when a state court is analyzing a jury instruction developed under
21      state law.  See Waddington v. Sarausad, --- U.S. ---, 129 S.Ct. 823,
        833-35, 172 L.Ed.2d 532 (2009) (emphasizing that this Court must
22      review a state court's resolution of an error in a state-law jury
        instruction "through the deferential lens of AEDPA").

23

24  Byrd v. Lewis, 566 F. 3d 855, 861-62 (9th Cir. 2009).  To prevail, petitioner must demonstrate

25  that an erroneous instruction "'so infected the entire trial that the resulting conviction violates

26  due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147).  In

1 making its determination, this court must evaluate the challenged jury instructions "'in the

2 context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843

3 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984), cert. denied, 469

4 U.S. 838 (1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must

5 inquire 'whether there is a reasonable likelihood that the jury has applied the challenged

6 instruction in a way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v.

7 California, 494 U.S. 370, 380 (1990)).

8        Under California law, kidnap for robbery "requires the . . . element of an intent to

9 rob, and intent which must be formed before the kidnaping commences.  If the intent to rob (even

10 though carried out during the course of the kidnaping) is formed after the victim is seized, the

11 offense, insofar as it relates to kidnaping, is simple kidnaping and not kidnaping for the purpose

12 of robbery."  People v. Bailey, 38 Cal.App.3d 693, 699 (Cal.App. 1974) (citing People v.

13 Tribble, 4 Cal.3d 826, 831-32 (1971).

14        The state court concluded that there was no error of state law in CALCRIM No.

15 1203, the instruction on kidnap for robbery given at petitioner's trial and, in particular, that the

16 instruction was adequate to express the state law requirement that the intent to rob must be

17 formed before the kidnap begins.  Although habeas corpus jurisdiction is unavailable for review

18 of alleged errors in the interpretation or application of state law, the state court's conclusions

19 appear to be fully supported by the record.  Since the instruction was not erroneous, there was no

20 violation of petitioner's right to due process.   The state court's rejection of this claim was

21 neither contrary to nor an unreasonable application of applicable principles of clearly established

22 federal law.  Petitioner's first claim for relief should be denied.

23        B.  Sufficiency of Evidence to Support Conviction for Aggravated Kidnapping

24        Petitioner's second claim is that was insufficient evidence to support her

25 conviction for aggravated kidnapping.  Specifically, petitioner claims that there was no evidence

26 she intended to commit robbery before the kidnapping began.  The last reasoned state court

rejection of this claim is the decision of the California Court of Appeal for the Third Appellate

District on petitioner's direct appeal, which rejected the claim as follows:

> Defendants argue that there is insufficient evidence to prove them guilty of aggravated kidnapping in count four.  They maintain there is no evidence to show that they acted with the specific intent to rob L.R. at the time they moved her from the park to the car.  The record does not support defendants' argument.

> When a defendant challenges the sufficiency of the evidence, the reviewing court "must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573, . . . ], italics in original.)  '[T]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence – that is, evidence which is reasonable, credible, and of solid value – such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' (*People v. Johnson* (1980) 26 Cal.3d 557, 578 . . . .)" (*People v. Davis* (1995) 10 Cal.4th 463, 509 (*Davis*.)  "Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.  [Citation.]" (*In re Michael D.* (2002) 100 Cal.App.4th 115, 126.)  Indeed, we "'"presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]" (*Davis*, *supra*, at p. 509.)

> A person is guilty of kidnapping under California law if he or she "forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county . . . ." )§ 207, subd. (a).)  The Legislature dictates greater punishment for aggravated kidnapping under section 209, subdivision (b)(1) where the accused "kidnaps or carries away any individual to commit robbery . . . ."  Section 209 also requires asportation or "movement of the victim that is not merely incidental to the commission of the robbery, and which substantially increases the risk of harm over and above that necessarily present in the crime of robbery itself.  [Citations.]" (*People v. Rayford* (1994) 9 Cal. 4th 1, 12 (*Rayford*); see § 209, subd. (b)(2).)

> The parties agree that for them to be found guilty of aggravated kidnapping, the evidence must show that they intended to commit the robbery at the time they held or detained L.R.  "A person [cannot] kidnap and carry away his victim to commit robbery if the intent to rob [is] not formed until after the kidnap[p]ing ha[s] occurred." (*People v. Tribble* (1971) 4 Cal.3d 825, 831.)  Thus, the crime of aggravated kidnapping "'is similar to burglary where it

1    is necessary to show that the entry was with the intent to commit
     larceny or any felony.  An illegal entry but without such an intent is
2    not a burglary [citation]; similarly . . . ., kidnapping without intent
     to rob constitutes kidnapping but not kidnapping for purpose of
3    robbery; and a robbery during a kidnapping where the intent was
     formed after the asportation is a robbery and not a kidnapping for
4    purposes of robbery.' [Citations.]" (*Ibid.*)  Moreover, the robbery
     need not be completed.  "All that is required is that the defendant
5    have the specific intent to commit a robbery at the time the
     kidnap[p]ing begins." (*People v. Davis* (2005) 36 Cal.4th 510,
6    565-566.)

7       [Petitioner and her co-d]efendants claim they did not have the
     specific intent to rob L.R. at the time they put her in the Malibu.
8    They cite evidence to show that they decided to rob L.R. only after
     they drove away with L.R. and Buford showed them the photo of
9    the $700 on his cell phone.  All three maintain that there is no
     evidence they knew about the money before they placed L.R. in the
10    car.  [Petitioner and her co-d]efendants ignore the inferences to be
     drawn from the other evidence presented at trial.

11

12       Boone testified on redirect examination that Buford and Curry
     were looking for the $700 when Curry pulled L.R.'s clothes off at
13    the park.  Both [petitioner] and Curry told the district attorney's
     investigator that they heard Buford tell the others to "check for
14    money" while L.R. lay on the ground after the second assault.
     Buford told them that L.R. "had money someplace, she had just
15    gotten paid or something."  Russell also told the district attorney's
     investigator that she heard Buford ask L.R. where the money was
16    several times.  According to Russell's statement to the district
     attorney's investigator, thereafter, Curry ripped off L.R.'s clothes
17    and found the $20.  And in the car Buford said to L.R., "I thought
     you had $700."  We conclude that the jurors could reasonably infer
18    from this circumstantial evidence that [petitioner and her co-
     d]efendants knew about L.R.'s $700 before they put her in the car
19    and formed the required specific intent to rob her at that time. (*In
     re Michael D.*, *supra*, 100 Cal.App.4th at p. 126.)

20 People v. Curry et al., slip op. at 12-15, as modified on denial of rehearing, Jan. 23, 2008, at 2, ¶¶

21 3, 4, 5.

22       When a challenge is brought alleging insufficient evidence, federal habeas corpus

23 relief is available if it is found that upon the record evidence adduced at trial, viewed in the light

24 more favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond

25 a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the court

26 must review the entire record when the sufficiency of the evidence is challenged on habeas.

1  Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d

2  722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to 'resolve

3  conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic

4  facts to ultimate facts."  Jackson, 443 U.S. 307, 319.  "The question is not whether we are

5  personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the

6  conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

7  Under Jackson, the federal habeas court determines sufficiency of the evidence in reference to the

8  substantive elements of the criminal offense as defined by state law.  Jackson, 443 U.S. 307, 324

9  n.16.

10          As noted above, title 28 U.S.C. § 2254 (d) provides that an application for a writ

11  of habeas corpus shall not be granted with respect to a claim that was adjudicated on the merits in

12  state court proceedings unless the adjudication of the claim "(1) resulted in a decision that was

13  contrary to, or involved an  unreasonable application of clearly established federal law, as

14  determined by the Supreme Court of the United States; or (2) resulted in a decision that was

15  based on an unreasonable determination of the facts in light of the evidence presented in the state

16  court proceedings."  Further, 28 U.S.C. § 2254(e)(1) provides that "a determination of a factual

17  issue made by a State court shall be presumed to be correct.  The applicant shall have the burden

18  of rebutting the presumption of correctness by clear and convincing evidence."

19          The state court's conclusion that there was sufficient evidence to establish beyond

20  a reasonable doubt that petitioner formed the specific intent to rob L.R. before the kidnapping

21  began is not erroneous under the standards set forth above.  The court's decision was not contrary

22  to or an unreasonable application of federal law, nor was it based on an unreasonable

23  determination of the facts.  After reviewing the record independently, this court concludes that a

24  rational trier of fact could have found proof beyond a reasonable doubt that petitioner was guilty

25  of aggravated kidnapping.  Accordingly, this claim should be denied.

26  /////

1    C.  Petitioner's Third Claim

2         Petitioner's third claim reads as follows:

3         This court should grant review to reconsider it's holding.

4         While petitioner's primary defense at trial was that she did not
          know Roman was pregnant and never agreed to try to kill the fetus,
5         she also presented evidence to show she was impaired by Mad Dog
          20/20 and Ecstasy and therefore did not form the intent to kill or
6         know that Boone, the primary actor, intended to try to kill the fetus.

7    Amended Petition at 6.

8         As noted above, respondent observes that this claim "mirrors" a claim raised in

9    petitioner's petition for review to the California Supreme Court.  In ground III of her petition for

10   review to the California Supreme Court, petitioner contended that the state supreme court

11   "should grant review to reconsider its holding in *People v. Mendoza* (1998) 18 Cal.4th 1114."

12   Lodge Document No. 9, Petition for Review at 24.  The claim raised in the petition for review

13   challenged the use of CALCRIM No. 404 at petitioner's trial and, in particular, that part of the

14   instruction which provides:  "Do not consider evidence of intoxication in deciding whether

15   attempted murder is a natural and probable consequence of assault with a deadly weapon."  Id.

16   In part, petitioner argued that the instruction ran afoul of the equal protection clause of the

17   federal constitution and that the state supreme court should revisit the Mendoza decision to

18   "bring that case into line with other cases that address the applicability of the 'objective test' of

19   'whether a reasonable person under like circumstances' would have harbored a particular

20   knowledge or intent.'"  Id. at 24-25.  Petitioner also contended that the instruction interfered with

21   her "federal constitutional rights to present a defense, to argue her case in closing, to a fair trial

22   and to force the prosecution to prove every element of the charged offense beyond a reasonable

23   doubt."  Id. at 28.  That petition was denied in an order that contained no statement of reasons for

24   the decision.  Lodged Document No. 10.

25   /////

26   /////

14

In the state court of appeal, petitioner claimed that use of the challenged instructional language violated her constitutional rights to due process and equal protection.  In a lengthy discussion, the state court of appeal rejected those claims, as follows:

> As to the attempted murder of L.R.'s unborn child, the prosecutor offered three theories of [petitioner and her co-d]efendant's criminal liability:  (1) liability as perpetrators; (2) liability as aiders and abettors of attempted murder; and (2) liability [sic] as aiders and abettors of felony assault on L.R., the natural and probable consequence of which was attempted murder.  The court instructed the jury on these theories pursuant to CALCRIM Nos. 400 (aiding and Abetting:  General Principles), 401 (Aiding and Abetting:  Intended Crimes) and 402 (Natural and Probable Consequences Doctrine).  Because trial testimony showed that some if not all of the defendants were intoxicated when they assaulted L.R. at the park, the court also read the jury several instructions that addressed voluntary intoxication, including CALCRIM No. 404 (Intoxication), which stated:

> "If you conclude that a defendant was intoxicated at the time of the alleged crime, you may consider this evidence in deciding whether the defendant, A, knew a perpetrator intended to commit the felony assault, and, B, intended to aid and abet the felony assault.

> "Someone is intoxicated if he or she used any drug, drink or other substance that caused an intoxicating effect.

> "Do not consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault."[3]

---

[3]   The court gave other instructions on voluntary intoxication.  On the special allegation of premeditation and deliberation attached to the attempted murder charge, the court instructed the jury pursuant to CALCRIM No. 625 that it could consider evidence of voluntary intoxication "in deciding whether a defendant acted with an intent to kill or the defendant acted with deliberation and premeditation."

It also instructed the jury more generally regarding voluntary intoxication pursuant to CALCRIM No. 3426:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in the limited way specified in the instructions.  You may consider that evidence in deciding whether the defendant acted with the specific intent required for the crime.

"The people have the burden of proving beyond a reasonable doubt that the defendant acted with the specific intent required for Counts One, Three, Four, Five and Six and the special finding of premeditation and deliberation relating to Count One and termination of the pregnancy in Count Two.

"If the people have not met this burden, you must find the defendant not guilty of those crimes and the allegations not true.

"You must not consider evidence of voluntary intoxication for any other purpose.  Voluntary

. . . .  [Petitioner] argue[s] that the court erred when it told the jury to disregard [her] voluntary intoxication when considering [her] liability for attempted murder as the natural and probable consequence of assault.  [Petitioner] maintains that the error violated her constitutional rights to due process and equal protection. . . .   We conclude that the instructions on voluntary intoxication were correct statements of the law.  And even if the instructions were flawed, the error was harmless in light of the record and the verdicts returned by the jury.

. . . .

[Petitioner] maintain[s] that the last sentence of CALCRIM No. 404 is misleading regarding the effect of intoxication on [her] understanding of whether attempted murder was a reasonably foreseeable consequence of the group's joint assault on L.R.  Specifically, with respect to the equal protection claim, [petitioner] contends that "an aider and abettor who is alleged to know the perpetrator's intent to kill at the beginning of an offense can use the intoxication defense, but an aider and abettor [like [petitioner]] who does not know that the perpetrator intends to kill cannot use the same [defense]."  [Petitioner] argued at oral argument that it was unfair that the intoxication defense was unavailable to her, the defendant alleged to be most "far removed" from the assault in terms of knowledge and participation. . . . .

**1.  [Petitioner]'s Knowledge of and Participation in the Felony Assault**

Notwithstanding [petitioner]'s testimony that when Buford called Boone and her in the car did she first realize that Buford wanted to force L.R. to have a miscarriage, [petitioner] attempts to minimize her knowledge of and participation in the assault.  Nevertheless, [petitioner]'s argument that as the defendant alleged to be the most "far removed" from the assault in terms of knowledge and participation it is unfair that the intoxication defense was unavailable to her is both misplaced and inaccurate.  [Petitioner] does not cite, and we do not know of, a case that measures the degree of the knowledge and intent of the aider and abettor.  It is only necessary that the prosecution prove and aider and abettor had knowledge of her confederates' criminal purpose

intoxication is not a defense to Count Two, assault by means of force likely to produce great bodily injury or deadly weapon or the lesser crimes of assault, battery, false imprisonment or kidnapping.

"I read to you [that] you may not consider evidence of involuntary [*sic*] intoxication for any other purpose.  I'm going to say that you may not consider evidence of voluntary intoxication for any purpose not specifically stated in these instructions."

and the intent to encourage or facilitate that purpose.  Once the jury makes these findings, it can convict a defendant of the intended crime and any other crime committed that was a natural and probable consequence of the intended crime.  (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1123 (*Mendoza*).)  "Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target offense, but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the target offense."  (*People v. Prettyman* (1996) 14 Cal.4th 248, 260-262 (*Prettyman*).)  It follows then that the jury need not measure the degree of a defendant's knowledge of intent.

As to [petitioner]'s argument that the intoxication defense was unavailable to her, she is only partly accurate.  It was unavailable only as to whether attempted murder was a natural and probable consequence of felony assault.  Otherwise, the jury received, was instructed on, and rejected the evidence of intoxication on the aider and abettor theory of liability.

## 2.  CALCRIM No. 404 and the *Mendoza* Case:

As to CALCRIM No. 404, its last sentence, "Do not consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault" is based on language contained in *Mendoza*, *supra*, 18 Cal.4th at page 1133.  In that case, the Supreme Court described the mental state required to establish aider and abettor liability and clarified the impact of voluntary intoxication on that determination.  The *Mendoza* case began by explaining:  "'All persons concerned in the commission of a crime, . . . whether they directly commit the act constituting the offense, or aid and abet in its commission, . . . are principals in any crime so committed.'  (§ 31.)  Accordingly, an aider and abettor 'shares the guilt of the actual perpetrator.'  [Citation.]  The mental state necessary for conviction as an aider and abettor, however, is different from the mental state necessary for conviction as the actual perpetrator.  [¶]  The actual perpetrator must have whatever mental state is required for each crime charged . . . .  An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitation commission of, the offense.'  [Citation.]  The jury must find 'the intent to encourage and bring about conduct that is criminal, not the specific intent that is an element of the target offense . . . .'  [Citations.]  Once the necessary mental state is established, the aider and abettor is guilty not only of the intended, or target, offense, but also of any other crime the direct perpetrator actually commits that is a natural and probable consequence of the target offense.  [Citation.]"  (*id*. at pp. 1122-1123.)

The Supreme Court then turned to the question "whether evidence of voluntary intoxication is admissible on the question

17

whether a defendant tried as an aider and abettor had the required knowledge and intent." (*Mendoza*, *supra*, 18 Cal.4th at p. 1123.) It reviewed the historical development of section 22[4] and held that a jury may consider evidence of defendant's voluntary intoxication in deciding whether he or she had the knowledge and intent necessary for aiding and abetting commission of the target offense. (*Mendoza*, *supra*, at pp. 1118, 1131.) The *Mendoza* court also concluded that such evidence was admissible regardless of whether the target crime required general or specific intent. (*Id*. at p. 1132.) The Supreme Court emphasized that its holding was "very narrow" and explained, in language challenged by . . . [petitioner], that: "Defendants may present evidence of intoxication solely on the question whether they are liable for criminal acts as aiders and abettors. *Once a jury finds a defendant did knowingly and intentionally aid and abet a criminal act, intoxication evidence is irrelevant to the extent of the criminal liability.* A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime but also of any other crime the perpetrator actually commits that is a natural and probable consequence of the intended crime. The latter question is not whether the aider and abettor *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citation.} *Intoxication is irrelevant in deciding what is reasonably foreseeable.*" (*Id*. at p. 1133, some italics added.)

CALCRIM No. 404 is faithful to *Mendoza*. Regardless of . . . [petitioner]'s view that *Mendoza* misstates the law, we are bound by that decision. (*See Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Moreover, in our view, *Mendoza* does not misstate the law.

### 3. The Equal Protection Claim Fails:

[Petitioner] misreads *Mendoza* and its impact on the equal protection claim. "The constitutional guaranty of equal protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws has been judicially defined to mean that no person or class of persons shall be denied the same protection of the laws which is enjoyed by

---

[4] Section 22 currently reads: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act.

"(b) *Evidence of voluntary intoxication is admissible solely on the issue of whether o not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored express malice aforethought.*

"(c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance." (Italics added.)

18

other persons or other classes in like circumstances in their lives, liberty and property and in their pursuit of happiness.  [Citations.]  The concept recognizes that persons similarly situated with respect to the legitimate purpose of the law receive like treatment, but it does not, however, require absolute equality.  [Citations.]" (*People v. Romo (1975)* 14 Cal.3d 189, 196.)

An aider and abettor charged with attempted murder who is aware of the perpetrator's intent to kill before the offense, is not similarly situated to an aider and abettor charged with attempted murder as a reasonably foreseeable consequence of felony assault under a natural and probable consequence theory.  While these two theories share a knowledge and intent requirement, the natural and probable consequence theory requires more.  In the latter case, after the jury finds the required knowledge and intent, it must also determine, based on an *objective test*, whether the attempted murder is the natural and probable consequence of the felony assault.  This determination is based on whether the charged offense is a reasonably foreseeable consequence of his confederates' action.  (*Prettyman*, *supra*, 14 Cal.4th at pp. 260-261.)  Thus, the determination does not implicate the aider and abettor's mental state.

*Mendoza* holds that evidence of voluntary intoxication is admissible on the question of knowledge and intent (*Mendoza*, *supra*, 18 Cal.4th at pp. 1118, 1131), which requires the jury to engaged in a *subjective* analysis of whether intoxication affected the defendant's formation of the required mental state.  The *Mendoza* court properly concluded that "[i]ntoxication is irrelevant in deciding what is reasonably foreseeable." (*Id*. at p. 1133.)

However, even if we were to conclude the jury should have been instructed to consider [petitioner']s intoxication in deciding whether attempted murder was a natural and probable consequence of the assault, it is clear . . . [petitioner] was [not] prejudiced by any alleged instructional error.

In finding [petitioner] guilty of attempted murder, the jury found true the allegation that she acted with premeditation and personally used a deadly and dangerous weapon. . . .  The jury also found . . . [petitioner] guilty of assault and found true the allegation that [she] personally inflicted great bodily injury upon L.R., when [she] knew or should have known L.R. was pregnant.  These findings demonstrate that the jury:  (1)  rejected [petitioner']s voluntary intoxication claims and (2) found . . . [petitioner] guilty as [a] perpetrator[].  Indeed [petitioner] acknowledge she felt the effects of alcohol and Ecstasy the night of the assault, but "[n]ot so much to the point where I didn't know what I was doing."  Thus, any error in instructing the jury not to consider evidence of intoxication in deciding whether attempted murder is a natural and probable consequence of felony assault was harmless.  The jury's

1                    findings also preclude any claim of prejudice from [petitioner]'s
2                    claim that CALCRIM No. 404 violated her constitutional rights.

3   People v. Curry et al., slip op. at 23-32.

4              At bottom, the claim at bar rests on an alleged error of state law:  the claim is

5   grounded in petitioner's contention that the California Supreme Court erred in holding that

6   voluntary intoxication is irrelevant to the objective question of whether a charged crime is a

7   reasonably foreseeable consequence of actions that are aided and abetted.  That question is not

8   reviewable in this federal habeas corpus proceeding.  See Windham v. Merkle, 163 F.3d 1092,

9   1107 (9th Cir. 1998) (quoting Middleton v. Cupp, 768 F.2d at 1085) ("Habeas corpus relief is

10   'unavailable for alleged error in the interpretation or application of state law.'").  Application of

11   the holding in Mendoza in petitioner's case did not render her trial fundamentally unfair in

12   violation of the requirements of federal due process.  See Estelle, supra.  Moreover, the state

13   court's analysis of petitioner's equal protection clause claim is entirely congruent with applicable

14   principles of federal equal protection jurisprudence.  Finally, petitioner's remaining federal

15   contentions are unavailing; the scope of the voluntary intoxication defense in this case was

16   circumscribed for purposes of the instant claim by the holding in Mendoza.

17              The state court's rejection of this claim was congruent with applicable principles

18   of federal law.  This claim should be denied.

19       D.  Petitioner's Fourth Claim

20              Petitioner's fourth claim reads as follows:

21              This court should grant review to determine that aiders and abettors
22              convicted under the natural and probable consequences....

23              Petitioner also challenged the legality of attaching a premeditation
                    finding to her when the instructions did not require proof that she
                    personally premeditated.  The instruction explaining aiding and
24              abetting liability under the natural and probable consequences
                    theory required jurors to determine whether attempted murder was

25   /////

26   /////

a natural and probable consequence of felony assault, but did not require them to determine premeditated....

Amended Petition at 6.

Respondent directs the court's attention to petitioner's claim in her petition for review to the California Supreme Court, where petitioner claimed that her right to due process was violated by use of certain jury instructions which allowed jurors to find premeditation even if petitioner did not premeditate or know that anyone else did.

The last reasoned state court rejection of this claim is the decision of the California Court of Appeal for the Third Appellate District, which rejected the claim as follows:

As we explained, the prosecutor tried defendants for attempted premeditated murder of L.R.'s unborn child in count one on three theories:  (1) as perpetrators;  (2)  as aiders and abettors of attempted murder; and (3) as aiders and abettors of felony assault on L.R., the natural and probable consequence of which was attempted murder.  The court instructed the jury on the special finding in count one:  "The special finding of premeditation and deliberation may be found true where a principle [sic] attempted a willful, deliberate and premeditated murder even though the aider and abettor did not personally deliberate or premeditate.  The aider and abettor must share the intent to kill."  However, when instructing on [sic] the jury on attempted murder as a natural and probable consequence of felony assault, the court did not describe the offense as *premeditated* attempted murder.[5]

_____

[5]   The instructions read in their entirety:
"The defendant is charged in Count Two with assault with a deadly weapon or with force likely to produce great bodily injury, felony assault.  In Count One, with attempted murder.
"You must first decide whether the defendant is guilty of felony assault.  If you find the defendant is guilty of this crime, you must then decide whether he or she is guilty of attempted murder.
"Under certain circumstances, a person who is guilty of one crime may also be guilty of the other crimes that were committed at the same time.
"To prove that the defendant is guilty of attempted murder, the people must prove that, one, the defendant . . . is guilty of felony assault.  Two, during the commission of the felony assault, the crime of attempted murder was committed, and, three, under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of attempted murder was a natural and probable consequence of the commission of the felony

21

Russell argues that these instructions improperly "allowed [the] jurors to attach a premeditation finding to [her] attempted murder charge, even if they explicitly found she did not personally premeditate, exposing her to a sentence of life without parole . . . ." She also maintains that the instructional error violated her constitutional right to due process.  We conclude the instructions were a correct statement of the law, and even if the instructions were improper, Russell suffered no prejudice.

Russell misreads the instruction on premeditation and deliberation.  To find and aider and abettor criminally liable for premeditated attempted murder, the jury must find that the defendant "share[d] the intent to kill."  A jury could not make a true finding on the special allegation on premeditation if it determined that Russell only intended to aid and abet a perpetrator in felony assault without harboring the intent to kill L.R.'s unborn child.

Moreover, *People v. Lee* (2003) 31 Cal. 4th 613 (*Lee*) holds that a person may be convicted of premeditated attempted murder as an aider and abettor even if he or she did not personally act with willfulness, deliberation and premeditation.  (*Id*. at pp. 624 & 627.) Russell acknowledges this proposition as far as it goes, but notes that the Supreme Court left open the question whether the same rules [sic] applies where the defendant is found guilty of attempted murder on a theory of natural and probable consequences.  We agree with the reasoning of *People v. Cummins* (2005) 127 Cal.App.4th 667, 680 and *People v. Laster* (1997) 52 Cal.App.4th 1450, 1473 that *Lee* should apply in a case involving the natural and probable consequences doctrine.

Russell also urges us not to apply *Lee* in the circumstances of this case because: (1) a person who "only aids and abets a lesser offense than attempted murder is insufficiently blameworthy for the harsh life sentence that premeditated attempted murder carries;" (2) imposing a life sentence on a defendant who has not directly aided and abetted an attempted premeditated murder would violate the federal and state constitutions; and (3) *Lee* undermines the subsequent Supreme Court ruling in *People v. Seel* (2004) 34 Cal.4th 535 which holds that premeditation is an element of the offense of attempted murder.  We need not address these arguments.  Even if the court erred in instructing the jury on premeditation in the circumstances of this case, the error was harmless beyond a reasonable doubt.

---

assault.

"A natural and probable consequence is one that a reasonable person would know was likely to happen if nothing unusual intervenes."

The jury convicted Russell of conspiracy to commit murder in addition to premeditated attempted murder. In finding Russell guilty of conspiracy to commit murder, the jury necessarily found that she premeditated and deliberated the murder of L.R.'s unborn child. (See *People v. Cortez* (1998) 18 Cal.4th 1223, 1232 ["The mental state required for conviction of conspiracy to commit murder necessarily establishes premeditation and deliberation of the target offense of murder"], italics omitted.)

The record provides overwhelming support for the jury's findings. Russell drove L.R. to the park fully aware of the plans to beat her up in an attempt to cause a miscarriage. She punched L.R. in the face during the first assault. Although Russell and Boone left in the Malibu after L.R. had been and robbed of her shoes and cell phone they returned to the park when Buford phoned and told them to return and "finish the job." Boone testified that she asked Buford if he was trying to kill L.R., and Buford said, "[N]o, just the baby." He wanted Boone to continue, "as long as that baby gets up out of her." This time the two women came armed with a baseball bat and flashlight which Russell used to strike L.R. on the head. The second assault left L.R. unconscious.

People v. Curry, slip op. at 34-37.

As the state court found, under California law petitioner's conviction for conspiracy to commit murder includes a finding that petitioner premeditated and deliberated murdering L.R.'s unborn child. The state court's determination that these findings were supported by the record was entirely reasonable. As noted above, to prevail on her claim that the jury instructions violated her right to due process, petitioner must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting conviction violates due process.'" Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. at 147). The state court's rejection of this claim was entirely congruent with applicable principles of United States Supreme Court precedent. This claim should be denied.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "[t]he district court must issue or a deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11, 28 U.S.C. foll. § 2254. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The court must either

1   issue a certificate of appealability indicating which issues satisfy the required showing or must

2   state the reasons why such a certificate should not issue.  Fed. R. App. P. 22(b).  For the reasons

3   set forth in these findings and recommendations, petitioner has not made a substantial showing of

4   the denial of a constitutional right.  Accordingly, no certificate of appealability should issue.

5         For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that:

6         1.  Petitioner's application for a writ of habeas corpus be denied; and

7         2.  The district court decline to issue a certificate of appealability.

8         These findings and recommendations are submitted to the United States District

9   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

10  days after being served with these findings and recommendations, any party may file written

11  objections with the court and serve a copy on all parties.  Such a document should be captioned

12  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

13  objections shall be filed and served within fourteen days after service of the objections.  The

14  parties are advised that failure to file objections within the specified time may waive the right to

15  appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

16  DATED: August 1, 2011.

17

18

19  UNITED STATES MAGISTRATE JUDGE

20  12

21  russ1538.157

22

23

24

25

26